GRIFFIS, J.,
for the Court.
¶ 1. James Abner (“Abner”) and Nora Ruth Gresham (collectively, the “Gres- *582 hams”) brought this action to quiet title against their neighbors Alton Lynn (“Lynn”) and Genevieve C. Jones (collectively, the “Joneses”) after a dispute arose as to ownership of a driveway. In the alternative, the Greshams asked for title by adverse possession or for a prescriptive easement. The chancellor held the driveway was part of the Greshams’ property. On appeal, the Joneses argue that the chancellor erred in relying on the Gres-hams’ survey. We find no error and affirm.
FACTS
¶ 2. In 1991, the Greshams purchased an interest in Lot 1221 of the Lake Arrowhead Subdivision in Myrtle, Union County. The next year, the couple bought the remaining interest from their co-tenant. Lot 1221 is located at the end of a cul-de-sac on Lake Breeze Drive. The property is roughly half an acre. It is bounded on the north by Lake Arrowhead, on the east by Lot 1222, on the south by the cul-de-sac, on the southwest by Lot 1219, and on the west by the Lake Arrowhead levee. On the Greshams’ lot is a cabin with a deck. There is also a small pier. The Greshams use the cabin as a vacation home, which they visit a couple of times a month. To the right of the cabin is a gravel driveway (“the disputed driveway”), which runs from Lake Breeze Drive past the Greshams’ cabin, although not all the way to the lake. There are steps from the disputed driveway to the Greshams’ cabin.
¶ 3. At the time the Greshams purchased the land, Lot 1222 was owned by Mary Sue Parrish. Lot 1222 is approximately half an acre, and it is bounded on the north and east by Lake Arrowhead, on the southeast by Lot 1223, on the southwest by the cul-de-sac, and on the west by the Greshams’ lot. There is a separate gravel driveway to the right of the disputed driveway. It is undisputed that this separate driveway belongs to Lot 1222. At the time, the separate driveway led to Parrish’s trailer. There is no longer a trailer or any type of residence on Lot 1222.
¶4. Both driveways fork off from the same point on the cul de sac. Between the two driveways is grass and a group of trees. Parrish and Billy Williams, owner of lot 1223, used the separate driveway. The Greshams used the disputed driveway. Sometimes Parrish and the Greshams would let each other turn around and exit from the others’ driveways. Abner, Parrish’s son, and Williams jointly constructed gates on the driveways. They placed a metal post between the two driveways where they believed the property line lay, and a metal post to the left of the disputed driveway and the right of the separate driveway. From these posts, they attached two separate gates, one leading to each driveway.
¶ 5. In July 2001, the Joneses purchased Parrish’s lot, along with eleven other non-contiguous lots. Lynn removed both gates and had a bulldozer ready to “reconstruct the driveway.” After Abner told him that he could not give him permission to do that, Lynn told the Greshams they had two weeks to get a survey done to prove they owned the driveway. The next day, Lynn constructed a barbed wire fence that ran down the left side of the disputed driveway, all the way down to the lake. This moved the Greshams’ eastern boundary seven feet to the west. It reduced the Greshams’ cul-de-sac frontage, which made it more difficult to get cars in and out of their property. It also prevented the Greshams from driving their truck and boat to the water, because their deck ended only a few feet from the disputed driveway.
¶ 6. The Greshams sued the Joneses to quiet title. The chancellor was provided *583 with two competing surveys. The Gres-hams’ expert witness produced his survey and testified the Greshams owned the driveway. The Joneses’ expert witness testified that his survey indicated the Joneses owned driveway. The chancellor relied on the Greshams’ expert and entered a judgment favorable to the Gres-hams. Aggrieved, the Joneses appeal.
STANDARD OF REVIEW
¶ 7. A chancellor’s findings of fact will not be disturbed unless manifestly wrong or clearly erroneous. Sanderson v. Sanderson, 824 So.2d 623, 625(¶ 8) (Miss.2002). This Court will not disturb the findings of a chancellor when supported by substantial credible evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. Id. at 625-26(¶ 8).
¶ 8. The chancellor, by her presence in the courtroom, is best equipped to listen to the witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses. Howard v. Fulcher, 806 So.2d 328, 332(¶ 15) (Miss.Ct.App.2002). “It is necessarily the case that, when conflicting testimony on the same issue is presented, the chancellor sitting as trier of fact must determine which version he finds more credible.” Id.
ANALYSIS
¶ 9. The sole issue in this case is whether the chancellor erred in relying on one survey over the other. The Joneses argue that the chancellor should not have relied upon the Greshams’ survey because it contained error. The Greshams counter that the chancellor merely made a credibility determination, and there is substantial credible evidence to support her decision.
¶ 10. It is not unusual for a chancellor to be presented with conflicting evidence of a boundary line, including two competing surveys that reach different conclusions. See, e.g., Hulbert v. Fayard, 230 Miss. 1, 5, 92 So.2d 247, 249 (1957); Wicker v. Harvey, 937 So.2d 983, 988-89 (¶¶ 11-16) (Miss.Ct.App.2006). For example, in Hulbert, the Fayards sued the Hulberts to determine where the boundary line between their two properties lay. Hulbert, 230 Miss, at 5, 92 So.2d at 249. The Fayards presented testimony by a survey- or that supported their contention. Id. Likewise, the Hulberts presented a surveyor in support of their contention. Id. at 6, 92 So.2d at 249. The chancellor gave credence to the Fayards’ surveyor and established the boundary line accordingly. Id. at 9, 92 So.2d at 251. The court held the chancellor did not manifestly err. Id. This was because the lines established by the Hulberts’ survey did not conform to the long recognized lines of occupancy nor with the physical objects on the ground. Id. at 10, 92 So.2d at 251. On the other hand, the Fayards’ survey followed closely the lines of occupation which had been accepted for years, followed the calls of the deed, and was made with reference to fixed and established points with more definiteness than the Hulberts’ survey. Id., 92 So.2d at 251-52.
¶ 11. We recently examined a similar issue in Wicker. It involved a land line dispute, and this Court was asked whether a chancellor was bound to accept one party’s evidence over the other party’s evidence. Wicker, 937 So.2d at 991 (¶ 23). The deeds established that the boundary between the neighbors was an old gravel road, that apparently did not exist any more. Id. at 987(¶ 9). Wicker presented lay witnesses and a surveyor who established that the boundary line was at the existing Old Holmesville Road. Id. at *584 988(¶ 12), 990(¶ 20). His theory was that the old gravel road was one and the same with the new road. Id. at 990(¶ 20). Harvey presented lay evidence that the old gravel road used to exist south of the new road. His witnesses further testified that the boundary was marked by painted trees. Id. at 988-89 (¶¶ 14-15). The chancellor visited the property and found the red painted lines as well as other physical evidence corroborating the red painted line as the true boundary. Id. at 989(¶ 16). The chancellor held the red painted lines established the true boundary. Id. at (¶ 18). This Court held that the chancellor was not bound to accept Wicker’s evidence over Harvey’s. Id. at 991(¶ 23). Indeed, we held there was substantial credible evidence that the red line was the accepted boundary line. Id. at (¶ 24).
¶ 12. These cases instruct our decision here. It is for the chancellor to determine the credibility of the competing surveys, and we must affirm as long as the decision is supported by substantial credible evidence. The chancellor found:
Gresham asserted his property is accessed by the driveway that has been in existence for more than twenty years. The credible proof was that the driveway was also used by Gresham’s predecessor in title. At some point a number of years ago steps were constructed at the point where the driveway reaches Gresham’s .cabin. The Greshams are dependent upon the driveway for ingress and egress to their property, and no other driveway exists on their property. It is also pertinent that ... another driveway exists to access the Jones property.
[[Image here]]
This Court finds that the driveway in dispute is situated on the property of Gresham and that none of the same is located on the property of Jones. Both parties offered competent expert testimony of surveyors regarding the location of the boundary line between their lots. However, the Court gave particular weight to Hubert Foley’s greater familiarity with the location of the boundary lines in the subdivision as the original surveyor. Additionally, Foley’s survey is tied to an established section corner and accurately retraces the original plat. Accordingly, Foley’s survey based thereon, received herein as Exhibit 1 (6/6/05), is representative of the location of the boundary line between the lots and establishes that the driveway in dispute is clearly within the boundary line of Lot 1221, and thus on the property of Gresham.
[[Image here]]
Accordingly, based on the applicable law, the credible proof and the Court’s viewing of the property, the Court finds that the driveway in dispute is located within the boundary of Lot 1221 of Lake Arrowhead and that Gresham is record title holder of that Lot and driveway.
¶ 13. There is substantial credible evidence to support the chancellor’s finding. The deeds to both parcels of property merely describe each by lot number located in the Lake Arrowhead Subdivision. The subdivision plat is on file in the chancery clerk’s office.
¶ 14. Hubert Foley was the surveyor who testified on behalf of the Greshams. He was the original surveyor who platted the subdivision in the 1960s. As his starting point, he used an established government corner which was in existence at the time of the original survey which established the boundary lines. He testified the original corners and boundaries were marked by iron pins and old iron bed posts. When Foley ran his recent survey, it coordinated with these original markers. *585 In fact, some of them lined up perfectly with his survey and the rest came within two or three feet of his recent survey. One of these old markers was on the very boundary line that Foley contended was the Gresham/Jones line. Foley concluded from his survey that the boundary line between the Greshams’ and Joneses’ lots runs on the east edge of the disputed driveway. Therefore, the entire disputed driveway lay within the Greshams’ lot.
¶ 15. On the other hand, the Joneses’ surveyor used as a starting point a forestry monument that was not in existence at the time the subdivision was originally plotted out. His survey also did not coordinate with the original iron pins. According to the Joneses’ survey, some of the iron pins should have been out in the road. In fact, on the ground the iron pins were near the side of the road. The chancellor was justified in giving more weight to Foley’s survey.
¶ 16. Foley’s survey also coordinated with the lay testimony of the Gres-hams and Parrish. Parrish and the Gres-hams testified as to boundary markers they had placed over the years to show their understanding of where the boundary line lay. For one thing, the two different driveways themselves were placed by the predecessors in title. Secondly, Nora and Parrish jointly planted trees along the area where they believed the boundary was. In particular, there was a plum tree they said was planted on the line on Parrish’s side. There were also concrete blocks Parrish and Abner set out by the lake to prevent erosion. Parrish testified she placed the larger blocks on her side and Abner used the smaller blocks on his side. Abner also testified that he and Parrish’s son placed the gates’ middle post on the boundary line. As the photographs and witnessed indicated, Foley’s survey more closely follows these items and thus resembles the long understanding of the predecessors in title. We note that, “Acquiescence in a wrong boundary line will not establish it as the true line, but such acquiescence for a long period of time is evidence that such line is the true line.” Hulbert, 230 Miss. at 10, 92 So.2d at 251. “[I]f continued for a sufficient length of time, it will afford a conclusive presumption that the line thus acquiesced in is the true boundary line.” Wicker, 937 So.2d at 991-92(¶ 25).
¶ 17. Nevertheless the Joneses argue that the original plat did not close. However, Foley was asked this exact question in cross-examination:
Q. Okay. And is there any way to get an accurate survey off of that original plat if it does not close?
A. Yes, sir.
Q. How is that?
A. By relocating the original corners and measuring them back in.
[[Image here]]
A. The relocation of these two lots is going to be dependent upon the relocation of the original corners and of any found monuments nearby. And that’s the way it was reestablished.
Thus, the defect did not render Foley’s testimony unreliable.
¶ 18. We find that there was substantial credible evidence to support the chancellor’s decision. Foley’s survey coordinated with the original plat, original monuments, with the evidence on the ground, and with the long accepted understanding of the landowners. Accordingly, we affirm.
¶ 19. THE JUDGMENT OF THE CHANCERY COURT OF UNION COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
*586 KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.